The judges of the United States Court of Appeals for the Ninth Circuit. Hear ye, hear ye, all persons having business with the Honorable, the United States Court of Appeals for the Ninth Circuit will now draw near. Give your attention and you will be heard, for this court is now in session. God save the United States and this Honorable Court. Welcome to the Ninth Circuit. Judge Beatty and Judge Graber and I are glad for your timely appearance and we know this is on a quick turnaround and we appreciate all the hard work that's gone into it. We're ready to proceed with argument in State of Oregon, City of Portland v. Donald J. Trump, case number 26-6268. We'll first hear from Mr. MacArthur. Thank you, Judge Nelson, and may it please the court, Eric MacArthur for the federal government. I would like to reserve three minutes for rebuttal, if I may. For the second time in recent months, a district court in this circuit has entered a heretofore unprecedented order in joining the President from calling up the National Guard to protect federal personnel and property from violence aimed at thwarting federal law enforcement. The first order was swiftly stayed by this court and this order should be swiftly stayed as well. For months, the ICE facility in Portland and the federal law enforcement officers who work there have faced a steady stream of violence, threats of violence, and harassment from violent agitators bent on impeding federal immigration enforcement. Counsel, I'd like to ask a couple of questions and I would appreciate having other counsel answer the same questions when it's their turn. And my first question is, what document is the declaration pursuant to section 12406? Is that the June 7th document signed by the President? So I think there are a series of writings that the court can look to here. The first one that I would make is the statute doesn't actually require any writing, contemporaneous or otherwise, in order for the President to be able to invoke this statute. But there is here, there's the June 7th memorandum, there is the post on Truth Social on, I believe it was September 27th, stating that the President was responding to the request that had been made by the Department of Homeland Security. That's another document the court can look to is the document that the Department of Homeland Security sent requesting assistance in Portland. There are further posts on social media in early October, further explaining the President's basis for the decision he made in late September. And then last, there is the recent memorandum activating the National Guard in Illinois, which also references the basis for the activation in Portland. My second question is, under the second prong of that statute, what is the meaning of a rebellion? So the meaning of rebellion would be the same meaning of that term that existed at the time this language was enacted. It was enacted in 1903. And so there are contemporaneous dictionaries, I think one defined the term to mean a deliberate, organized resistance by force and arms to the laws and operations of the government. That's from Black's Law Dictionary in 1891. Counsel, can I ask about that? You're right that the current law was 1903, but it goes back to 1792. It seems like rebellion in this series of statutes would have a sort of developed meaning. Would it be improper to go back to earlier dictionary definitions or historical examples in analyzing the meaning of rebellion? Oh, I think that would be perfectly proper, Chet Nelson, to look historically how the term was understood and what are the historical examples in which that language had been invoked to call up the Guard. And the key example here is, of course, the Lifty Rebellion, which refutes the basis on which the district court held here that there was no coverable, factual basis for the president to conclude that there was a rebellion or danger of rebellion, because the court said there was no basis to conclude that any violence in Portland was aimed at overthrowing the entire federal government. Of course, no dictionary definition of the term rebellion requires that it be aimed at overthrowing the entire government. That wouldn't pick up historical circumstances like the Whiskey Rebellion. And I think it would lead to some pretty untenable results. For example, if you had a state governor who activated the National Guard and ordered them to shut down every ice facility in the state, the president couldn't say that's a rebellion against the authority of the government and activate the National Guard, because that's not aimed at overthrowing the entire government. My next question is regarding the third prong of the statute. And what is your view of the meaning of the phrase, the regular forces? So I think the regular forces are the forces that ordinarily enforce the laws that are at issue, and that the president has concluded that regular forces are unable to enforce. Here, I think that would be the officers of the Department of Homeland Security and Federal Protective Service. Does that include local officers, local police officers as well, or only the federal officers? I do not think that would include state and local officers, they are not charged with executing federal law. I think this is a statute that's solely focused on the federal forces that are at the president's disposal to execute the law. I just want to follow up on that. The section that immediately precedes 12406 is of course 12405, which appears to conjoin the regular forces as meaning the Army or the Air Force. And there is about a, well, from 1902, there's a Supreme Court case that appears to define the regular forces as the standing professional Army. What precedent would give it a broader meaning than that? I'm not sure it does have a broader meaning. I suppose it would be broader or narrower, but no one here has made the argument that the president has to first bring in the Army, the National Guard. That was, of course, not the case in Newsom, where the panel held in a published opinion that subsection three of the statute was satisfied. And I think that would be pretty extraordinary to say that the president has to use the actual armed forces before calling up the National Guard. For example, President Nixon did not do that when there was the postal strike, and he relied solely on section 12406 to activate state National Guards to execute postal laws. That I think would be inconsistent with historical precedent as well. Can I ask about that? You brought up the Nixon example. What was the basis for enforcing the laws of the United States? You mentioned postal laws. Are there laws that require mail to be delivered in a certain time? What were the laws that were at issue there? That's my understanding and my recollection of the executive order there was that President Nixon enumerated certain laws relating to the Postal Service and said that because of the strike, those laws could not be executed. And that was the basis for federalizing the National Guard. And my next question, which is, again, for all parties to address, I hope, and that is, what types of evidence are relevant in determining whether there is a colorable factual predicate? And specifically, I'm interested in how non-local evidence is relevant. Why is it important to know what happened in Los Angeles, Dallas, or Chicago when dealing with Oregon? And also, remote in time. The recent Newsom case dealt with events that predated the declaration by a day or two. So, what relevance does evidence have that's remote in time? So, to address the first part of your question, Judge Graber, I think the key evidence in this case is the declarations that we submitted below in connection with our opposition to the TRO motion that set forth the violence, the threats of violence that have occurred at this facility, and the unsustainable and unsafe diversion of the government's limited protective resources that has been necessary to contain the violence there. I think you have to keep in mind So, it sounds like you're relying on the local evidence. Am I right about that? The evidence having to do with Portland itself or Oregon itself? Certainly. We are relying on all of the evidence, but the historical evidence from earlier this summer in Portland, for example, when the ICE facility had to be shut down for more than three weeks because of the violence and the threats of violence, certainly informs what is the risk that the facility faces in Portland if you remove all of the protective forces that we've had to divert to contain that situation. So, I think that is one of the key errors here that the district court just made is taking this blinkered view of the statute where we're only looking at what's happening in Portland in the days or weeks ahead of the federalization. And to your question about why is what's going on in the rest of the country relevant, that's because the government only has limited protective services at its disposal. They have to call in 100 plus, 115 federal protective services officers have been brought in from other locations and deployed to provide 24-7 protection of the Portland facility. And our declarations below explain why that is neither safe nor sustainable, that they're not equipped to deal with that. Speaking of sustainable, those folks have gone home. Am I right? No, no, no. Some of them have gone home. There are so many of them deployed there. And certainly the president can take into account the fact that they are being pulled away from their normal duty stations. They are being tied down and are not available to address the violence that's occurring in other cities focused on enforcement of the immigration laws. How often does that happen where forces are reallocated like this? Is that unusual or is that regular? I don't have historical data on this, but I have to imagine that a diversion of this magnitude is quite irregular. If you look at the declaration from the deputy director of SPS, he said quite clearly that we are not equipped to deal with this kind of ongoing sustained unrest while the officers are expected to be able to respond to emergencies. They are not expected to work 12 hours a day, seven days a week, which has become the norm. That declaration states that it's neither safe nor sustainable. And that's, I think, something that the president can surely take into account in analyzing whether the regular forces are able to execute the laws. Judge Graber, to go back to your reference to the situation in Los Angeles, I think there are two main differences between what's happening in Portland and what's happening in Los Angeles. And neither is material to whether the president had a colorable basis, in fact, in law to invoke the statute here. Of course, one main difference is the violence was on a significantly larger scale in Los Angeles. But, of course, that was addressed here by the calibrated nature of the calling up of the guard. Only 200 members of the Oregon National Guard were called up compared to the 4,000 that were called up. How many guardsmen were actually deployed? I know that it said three or 4,000 could be called up, but how many were actually deployed in Los Angeles? I don't know the number. I think it was in the thousands that were actually deployed. It's significantly down now. My understanding is it's down in the low hundreds at this point. But the second difference that I wanted to focus on in Los Angeles is the president there made the decision to activate the guard immediately to deal with the acute threat. Whereas here, we first tried to manage the situation with the regular forces, and the president only activated the National Guard after it became clear that that was neither safe nor sustainable. The way the district court judge looked at this, where she refused to consider any of the evidence from June or July or earlier in the summer and didn't dispute that the conditions may have been met to activate the guard then, effectively penalizes the president for using the National Guard as a last resort rather than as a first resort, and I think creates a bad incentive to do. I have one, what I think might be my final question to you, which is really for you and not for other counsel, and that is with respect to the things that the district court did consider, are there any factual findings that you contend are clearly erroneous, and if so, precisely which ones? I think the answer to that, Judge Graber, is no, because I don't think there is a dispute about any of the relevant facts. I think the question is whether the undisputed facts, particularly the undisputed facts in the government's declarations, suffice to establish a colorable basis for invoking section 12406. So let me just be sure I understand your answer. You are not contending that any of the district court's factual findings are clearly erroneous. You're contending that she should have considered additional facts or come to a different conclusion, but you're not contending that any of the findings she made are clearly erroneous. Is that a fair summary? At least not insofar as the first stating that X events occurred on Y date. We're not disputing any of that. If we're getting beyond whether certain facts occurred to what, you know, sort of the risk that's presented by that, and whether that risk suffices to invoke the statute, I think there we're not in the circumstance where we have a factual finding. That's application of laws of fact. Is the assessment of risk as distinct from the effect of the amount of risk, is that a factual finding? In other words, if someone, this is just a hypothetical, if someone says the person was driving at eight miles an hour and that does not present a serious risk of, you know, running over a pedestrian, is the assessment of risk that stems from the underlying fact a factual conclusion or a legal conclusion? I think in certain circumstances an assessment of risk could be a factual conclusion. I don't think we have that here. I think what the district court said is that future risk is simply irrelevant. You only come up to what's actually happening. I think that clearly has to be wrong because future risk dictates what regular forces have to do now to counteract that future risk, and that is why we've had to have so many protective services officers at this facility 24-7 in a way that's neither safe nor sustainable. Can I ask about, you've made a review, and by the way, I know you've asked for time. We'll give you enough time to answer all of our questions. It may take each of you over the allocated times. I wanted to ask about the reviewability because you've made an argument that this is just not reviewable by the courts, and I understand your argument to be based on Martin, which has some pretty strong language that this is expressly within the discretion of the president. Newsom didn't adopt that argument. To what degree are we bound by that this is reviewable? I have not found any circuit precedent that speaks squarely to that question. In the East Bay case, the court said that a published panel stay decision may be binding on future panel deaths to the same issue. I think I can take that off the table. We have to preserve that argument. I will certainly be taking a run at the Newsom merits panel in a couple of weeks to try to persuade them that that's the one part of their opinion I think they got wrong, but for purposes of resolving this motion today, I think you can take that as the law of the circuit and ask whether we meet their deferential standard of review at the Newsom state panel. Can I just ask one follow-up question on that, though? I would be interested in your view of the history of the statutes because in 1792, there was some review. It didn't look like it was judicial review, but there had to be a preclearance by a justice of the Supreme Court. Then in 1795, that provision was taken out. In 1831, the statute expressly gave total discretion to the president of the United States. Then in our current statute, 1903, that total discretionary was taken out. Maybe you'll make that argument in the Newsom case, but I didn't see Newsom walk through that statutory history. It strikes me that that suggests that there might be some reviewability here based on the change between the 1831 statute and the 1903 statute. The reason I don't think that's right, Judge Nelson, is because I think you should compare the language of the statute as it exists today to the language of the statute in Martin and subsequently in Luther versus Borden. It's the exact same language. The statute is structured the exact same way. It's whenever, instead of conditions, the president may activate the National Guard. The court in Martin said that that was that statute vested in the president's sole and exclusive judgment whether the statutory preconditions were met. To the extent Martin left any uncertainty about whether that was binding just on subordinate military officials or instead also on the courts, I think that was cleared up in Luther versus Borden, where the court quite clearly, applying Martin, said that that was conclusive even on the courts. Maybe you've already answered this. Martin was binding in 1831. Would that language that was expressly put in the 1831 statute, in your view, would have been superfluous? Removing superfluous language in 1903, in your view, just had no effect? I think that's right. We don't know why that language may have been removed. They may have removed it because they thought it was unnecessary in light of the existing precedent from Martin and Luther. Congress enacted that statute in 1903 against the backdrop of those precedents. Ordinarily, we presume that when Congress takes language that has received a construction from the United States Supreme Court and replicates it in a new statute, it imports that settled construction of the statute. And that reason, I think, both as a matter of vertical stare decisis, a lower court is bound by Martin and Luther, and that is the correct interpretation of the statute because of that principle of interpretation. But again, I don't think this panel needs to get into that here. I think the likelihood of success on the merits in this case comes down to two questions that I just like to crystallize for the court, one of them about the law, one of them about the facts. The legal question is letter section 12406, colorably authorizes the president to call up the National Guard when violence and threats of violence directed at federal officials and facilities have significantly impeded federal law enforcement and required an unsustainable diversion of the regular forces in order to contain it. That's the legal question. The factual question is whether the facts of records here create a tolerable basis to believe that that is the situation in Portland. And I think the answer to both of those questions is quite clearly yes. I'd like to ask you a couple of questions. One is to go to the factual issues. There's a statement in Deputy Director Cantu's declaration that there are 776 federal protective service officers and only 497 are inspectors. But it wasn't clear to me what that means. Does that mean that only 497 officers are available nationwide to protect federal property? Is there a distinction between the 776 and the 497? I had understood, and I'd have to go back and look specifically at the language, but my recollection is the way I understood that was those are the officers who have the requisite training to be able to deal with these sort of civil unrest and violent protests and the others do not. All right. So when he says 115 federal protective service officers were deployed, you're saying that that means out of the 497 available to protect the federal building, which means roughly 25% of the officers available nationwide were deployed. That's how I understood it, and I think that's why he also said that this is just not sustainable. So the other question I have is more about our procedural posture. You saw the order on the administrative stay, and there is a second TRO that the district court entered after your notice of appeal was filed, and you are here before us now asking for a stay pending appeal, but don't we have the same issue that even if we were to stay, the first order, the second is still in place? There is that same issue, and I do want to be clear that the administrative stay that was granted doesn't, from our perspective, take the time pressure off giving a full stay pending appeal, because what we need is a full stay pending appeal so that we can then immediately go to the district court and say in light of that, the district court should dissolve that second TRO, because the second TRO rests on the exact same basis as the first TRO. So if this court grants a stay pending appeal concluding that interim relief here was not warranted because the government is likely to prevail on the merits or there is no irreparable harm or the slide is still or whatever, then I would expect the district court to immediately dissolve that second TRO, and if the district court did not, then at that point, I'm confident that we would be back up here again. Would you have run the time? I mean, you haven't even filed a notice of appeal. What if we... I probably wouldn't have signed to that, though. We are to decide on the state of the world as it exists today. And as it exists today, one of the things that you have the burden to demonstrate here, I think, is harm, that there's harm. And if the federalized National Guard members cannot be deployed, which is the state of affairs today, what is the harm that you are suffering? I mean, even if we grant the stay right now, I guess I have trouble seeing how there is harm if nothing changes. Well, the harm certainly is that we cannot deploy the Guard members to address the risks of violence. That's right, but that's not because of this case at this point. It's because of the second TRO. It's because of the terms of both of the TROs, which rests on precisely the same reasoning. And if the panel thinks that in order to establish irreparable harm, we need to bring that second TRO up for appeal now and get it consolidated, we can certainly do that. Our if the court grants a safe ending appeal here, that should be binding on that second TRO, and it should be dissolved by the district court. And so that would regress our irreparable harm. So can I ask about the 14-day nature? That's also different than California. California didn't have the district court, did not put the 14 days in there. Does that mean we need the rule before the expiration of that? I mean, do we know whether the district court is going to extend that? Can the district court extend it? If we don't rule within 14 days, does this all become moot? What's your view on all that? So the district court has scheduled a hearing, I believe, on October 17th, which is the day before the TRO expires on October 18th, to decide whether or not to extend the TRO for an additional 14 days. If the TRO does expire, either on the 18th or after it's extended for another 14 days, that would render this appeal moot. Hopefully, our view is that the panel should grant a safe ending appeal well in advance of any of that. And that would give guidance then to the district court. The court has also scheduled a preliminary injunction hearing for the end of the month on October 29th. And I think if the court granted a safe ending appeal here, the court's analysis of the likelihood of success on the equities would inform the preliminary injunction analysis and hopefully preclude the grant of a preliminary injunction. Or if not, at least require the district court to say any preliminary injunction that's granted. Otherwise, we're going to be right back up here repeating everything that we've just done. Okay. Any other questions by my colleagues? No. Thank you. We'll still give you three minutes for rebuttal. Thank you. May it please the court and counsel, Stacy Chaffin, on behalf of the plaintiffs. The President's 12406 determinations are entitled to great deference. But that deference has a limit. And that limit is this case. Where the President's determinations are untethered from reality, they cannot represent a colorable assessment of the facts within a range of honest judgments. I'd like to take first, Judge Faber, your question about what document represents the President's determination. And the answer is that we don't know. It's very unclear what document the President relied on to authorize the federalization of the National Guard. The two documents that we do have are the June 7th memorandum, which was issued in response to escalating ICE protests in Los Angeles. That memo is specifically referenced in the September 28th memorandum from Secretary Hegseth that mobilized the Oregon National Guard. That memo that was issued not only relies on the June 7th memo, it references it, and then it also attaches the June 7th memo. But that memo was issued four months prior. But you're not suggesting, you have raised an APA claim, but you're not suggesting that we need some formal order that represents final agency action by the President, are you? Not at this time. And we're not making arguments regarding the form of the order itself. But if the President was relying on the June 7th memorandum, that was both not relating to and it's exceptionally failed by the time that the National Guard was actually federalized in September. There's a significant deficit of time. So under your theory, then we can't consider any of the facts because the President didn't mention them? I don't know what the impetus for your argument is on that. Well, if the President, the June 7th memorandum, if that is the basis for the federalization of the National Troops, it has nothing to do with Portland. And it only has to do with the circumstances that were happening at that time in June. Council suggested though that the the social media post that said there's war in Portland and go forth and fix it is sort of an addendum, if you will, to or a direction to apply the June 7th memo to Portland. What's your response to that? Certainly the statute doesn't identify for us the form that the President's determination needs to take. And if the defendants are relying on a social media post, that social media post still isn't, it doesn't represent a colorable assessment of the facts within the range of honest judgment. Within that document, the President references Portland as war-ravaged, which we all know is not accurate. And then it also calls Portland under siege, also an inaccurate statement. Because these are inaccurate statements, they can't form the basis of a colorable argument under 12405. Well, that may be true, Council. But you're not denying, I mean, what we heard from your opposing council is there's really not a lot of dispute on the facts. There might be dispute as to which facts are relevant. Do you, I mean, do you think there's dispute of facts as to what's happened in June, July, August, September? I mean, do you, are there points in time where you think you have a disagreement on what's actually happened with opposing council? I think we disagree with the framing, but I would direct this court to the district court's findings regarding those facts. The district court found that the Portland ICE facility protests were small, less than 30 people, largely sedate and generally peaceful. Well, okay, hold on. I mean, that's clearly erroneous because there's clearly been protests that were above 30. I mean, unless you're trying to limit it to certain time periods, we have evidence in the record that there were protests as much as 200. It was generally small. I think there were three instances where it was large over that time period. But what, when we're talking about how to, as you say, frame the facts, can you go on to answer my other question, which is what is a rebellion? And, you know, what is the standard that we should be applying? A rebellion is an open, organized, or armed resistance to an established government or an attempt to change the government or the leader, usually through violence. That is the appropriate definition that this court should adopt in this case. And where does that come from? The same, the older definitions in Webster's. And I would highlight for the court that the first time that rebellion was added was in 1861, and that was shortly after the Confederacy declared independence. And the first shots were fired at Fort Sumter. And it's with that context in mind that we should interpret the word rebellion. And it certainly isn't a whiskey rebellion. The whiskey rebellion certainly comes into play as well. But I think with. Could that inform our definition of rebellion? Or was that the president acted under some different provision? I'm sorry, I don't know the exact answer to that question. But I can say that the defendant's proposed definition here is so broad that it could potentially encompass a significant amount of protected speech and protest activity in their. My concern is, and that may be true, but your definition and perhaps the definition applied by the district court seems so narrow that it doesn't even comport with the vast exercise. I shouldn't say vast, it hasn't been that many. But with those incidences where the National Guard has been used or the militia has been used, it wouldn't satisfy the rebellion prong in those either. And I can't specifically point to the situations where the rebellion prong has been utilized. But I do know that in Newsom, this court identified that both invasions and rebellions are unusual and extreme emergencies that threaten the normal operation of civil government. So it needs to be this significant, intense, large-scale situation that really, it has such a large impact on the fabric of the country. I mean, if we're comparing it to an earthquake, it goes to the heart of the safety of our country. And when it explains also why the president has deference in these circumstances, that he's expected to respond to sudden emergencies that are upon great occasions and under circumstances which may be vital to the existence of the union. It is under that framework that we define the phrase rebellion or even threat of rebellion. I'm sorry, I was going to ask you to move to my question concerning what type of evidence is relevant, particularly in terms of time. How current, the proclamation or memo of June 7th refers to current circumstances that would justify mobilization. So what, in your view, is the appropriate time frame to be looking at for determining whether the statutory standard is met? From a larger perspective, that really is going to depend on the circumstances. And we're not asking this court to create a very specifically defined set of factors that need to be evaluated in every case. But in this case, when the president has authorized the federalization of the National Guard in Oregon, we're asking this court to look at the circumstances around when that happened. So do we look from June 7th forward or do we look only at September or something else? It would make sense to, it's reasonable to look at around the time period when the National Guard was actually federalized. What happened in June, and we acknowledge... Isn't June around the time period of when the National Guard was federalized? It was four months prior. And that is significant because there can be, and there was, a very large delta between what was going on in June and what was actually going on when the president... So could the president have, in your view, nationalized the Guard in June? I think we'd be having a different conversation and it would certainly be a closer call. So the president loses his right to do that, in your view, because he waits to see how things turn out on the ground. I think in the moment, the president can make the decision to manage the situation with the normal forces. And here, what we have is even that situation in June, I would point the court to, I think it was June 14th. It's probably the worst of the circumstances that happened. And that day, the threat of violence from the protesters lasted two hours. And it's with the use of normal forces that they could stop the incursion of the protesters, push them back, and everyone kind of had the safety that was necessary with using the normal forces. That stands in stark contrast to what happened in California. In California, there was a span of two days where they had consistent and increasing protest activity, where they were pinning down officers, throwing concrete chunks. They used dumpsters as battering rams to breach the facility. And the next day, the confrontation lasted for another seven hours. Protesters boxed in officers, threw Molotov cocktails, mortar-style fireworks, rocks. They blocked traffic and burned a vehicle. But that's a little bit of the irony here, is that because the president acted in June in L.A. I mean, I don't know that we have the, I don't know, but it seems like we don't have the same level of violence going on in L.A. right now. But the president acted when there was and you're saying, well, if you don't hit it within a narrow window, you lose your right. That just seems unnaturally constrained. I mean, what the president did was bring in 115 F.P.S. officials, and that has quelled the violence to some degree, it seems. But it hasn't abated it. I mean, there's still violence going on, right? Well, what we have is the finding from the district court that the federal law enforcement officers, unaided by military forces, were capable of not only quelling the violence in June, but also preventing it through September. I'd like to ask you about some specific facts that I don't think are disputed. So the facility was forced to close. It was inoperable for almost a month from June 13th to July 7th. And the declarations from the director of the federal protective services and the field operations director from DHS state that the facility only reopened because of a surge of 115 F.P.S. officers to Portland, right? So those are facts that occurred, but that the district judge didn't consider because she apparently viewed them as out of time, that this had occurred. Are those not facts that are relevant for the president to determine the threat and whether there's a threat to DHS being able to enforce the 400 laws it's tasked with enforcing? I mean, they couldn't operate a facility. I don't know that that ever happened in L.A. There were attempts to breach a facility. Here, a facility was actually closed for almost a month, and the record includes more than one, at least two attempts to burn the building down and vandalizing the building so that it's difficult for the officers to move in and out of the building and increases danger. And the building is now currently boarded up, and the city has told DHS they have to remove the board. So that means this facility presumably will be inoperable again. So why is all of that irrelevant to the president's decision to federalize the National Guard? Well, I'd like to push back a little bit on the reframing here. What we have is in early June, the facility was closed for two weeks during specific dates, June 13th through July 7th. That is not two weeks. It's about three and a half, and I think it's properly characterized as nearly a month. But the facility was indeed closed, but the district judge didn't consider it because it was in June. So if I understand your position, only things that happened like September 24th, 25th, 26th, I mean, a very small window of time, those are the only days that the president could have legally considered when deciding whether there was a threat to the enforcement of law? Well, if we're talking about the third prong, the inability to execute laws with the regular forces, that is a current temporal requirement. Okay. So what is your basis for saying that? Because I don't think they knew some, but what is it, where is it that it says there's a, because they talked about the facts there, which happened to include events that had occurred in the preceding days. Here, the president relied on, according to the declarations that have been presented, on the facts leading up to the order from June, July, and August and September. So there's a period of a few months where things were unfolding on the ground. And what I think you're saying is we can't consider any of that, that it should only be a few days, but what is your basis for saying that? The text of the statute is the basis. So if we look at the third prong, it says the president is unable, that is a current inability to execute with the regular forces, the laws of the United States. And is that a day by day? So that, I mean, if we said forces are allowed, and then what, we come back the next day and say, oh, well, you got it under control. Now they're not allowed. Then it goes back up. Oh, they're allowed. I mean, it just seems like such a tortured reading of statute. I mean, I'm not even sure President Lincoln would have been able to bring in forces when he did, because he'd have to wait, you know, if he didn't do it right after, immediately after Fort Sumter, your argument would be, oh, things are okay right now. What is the effect of the June 7th authorizations statement that the National Guard should be performing federal functions at locations where protests against these functions are occurring or likely to occur based on current threat assessments? So does that limit how we or how Secretary Hagseth would have had to consider what was currently appropriate? Yes. If the June 7th memorandum is part of this court's evaluation of the President's determination, it is limited by the current situation. And I would also, again, just direct this court back to the text of the statute, which there is an expectation that the circumstances are going to be evaluated as they happen. And that makes sense because these are emergencies. These are unusual circumstances that would immediately require the President's attention and response. If these are circumstances that are so significant that they could challenge kind of the fabric of our nation, the threat of invasion, they need an immediate response. And there isn't an attempt to penalize the President for waiting. There is a requirement that the circumstances, as they happen, be so significant that we need to federalize the National Guard. Actually, for number three, I don't think that's true. For three, it says the President, with regular forces, can't execute the laws. I mean, I'm sort of trying to figure out how a district court of any nature is supposed to get in and question whether the President's assessment of executing the laws is right or wrong. Well, this court has already concluded that there is judicial review. I understand that, but it's also great deference. And I mean, here, it has to be colorable. And so when the President comes in and says, look, we've got 115 FPS forces that aren't normally in Portland, and we've had to move them, this is straining our ability to execute the laws. I don't understand how you can question the behind the scenes to say, oh, no, that can't be right. I mean, we don't have a view into what laws are trying to be executed or how they're being impinged. But why isn't that colorable? Because it's not true, unfortunately. It's not true that 115 FPS forces have been there since it reopened in July? Well, we do have in the record that a lot of the search forces were returned before the President's announcement. So I understand that these declarations kind of, they discuss the worst of the circumstances, which I understand. But they're also written by supervisors who don't work in Portland. They're from outside of the city. I have absolutely no idea. The district court said the same thing. I have absolutely no idea what that has to do with anything. You want to focus on what's going on outside and it doesn't rise to this level. But that's not what the statute says. The statute says the President can't execute the laws. That's an internal decision making. And whether there's a ton of protests or low protests, they can still have an impact on his ability to execute the laws. But this court has said that minimal interference isn't enough to raise the level of an inability to execute laws. And that's what we have here. We have, yes, in June, there were more intense protests. But we have the district court identifying that the normal forces were able to manage those protests, which is within the job responsibilities of FPS generally. This is what we do. They do. You have from the declaration- But this just seems to be the wrong analysis. And the district court did this. The district court said, well, look, people who acted violently were arrested, so everything's good. But that's not what the statute says. The statute says the President can't execute the laws. And I'm just trying to figure out why we're giving district courts the ability to say, well, this is what I see on the outside. So therefore, I'm going to transfer that onto what's going on behind the scenes. And we have declarations that say that it is their function. We have declarations that say we're short-staffed. We're having administrative difficulties because we don't have enough people. That is not a reason to bring the military into the streets of Portland or any other city in the United States. There needs to be something more than a deficit of employees to raise to the level of such a significant incursion into sovereignty of a state. It needs to be more. And this is the case. Into the street. The deployment is limited just to the protection of federal personnel and federal property. So I saw quite a bit of that language in the motions suggesting that National Guard members would be deployed to patrol the streets of Portland, which is-I don't think the government has ever said that that is the intent. The idea is to protect the building so that it can remain open for federal personnel. But what we do have, though, is a history of a very expansive and almost strange reading from the government of the district court orders. And it would-because this authorization is to protect any federal government location, any federal personnel-federal personnel go throughout the to execute whatever their mission is. And there's no-as of the drafting, there's no specific limitation that they're going to only- Why would we join it up front? I mean, I want to be clear. I'm very sensitive to the slippery slope argument that's being made here and the slippery slope argument that's being made in LA and around the country. It's a-I mean, this is something that, I mean, clearly the founders were concerned about. There's been a lot of debate about how this should be used. So I'm not trying to diminish that. It may well be that the forces are used in an improper way, but we don't have any evidence of that right now. All we have is a document that says we have a federal facility under attack or that violence has been, you know, forced it to close down, um, and we want to protect it. That doesn't strike me as a glaring overuse on its face. Now, if what happens is what you're suggesting, uh, that they do engage in law enforcement activities, then obviously we have another problem. But that's not even what the district court found. I mean, you couldn't find it. There's no-there's no deployment at this point. Well, certainly. I mean, we're not talking about, like, the-the violations of the Apothecomatosis Act at this point. It's a bit speculative. But what we have is from Newsom, we know that this court has a role in evaluating the president's determinations. There is a direction that is this court's role. This is the case bill that represents the outer limits of the president's authorities. We have in the month leading up-not even the week. If we look at the entire month of September, the district court found there was one instance in the-kind of the weeks leading up where protesters shined flashlights in the eyes of drivers. There was- Well, I-I mean, if-if that's true, then I think we've got a problem because I don't think that's what the record says. I mean, if the district court really said that's all that happened in September, then the district court's clearly erroneous. I didn't think the district court said that. I thought the district court actually detailed more than just one incident in September where flashlights were shined in the eyes. Well, Your Honor, that-that's the record, though. Even if we go back to- Well, let-we'll have to go into it. But I-I-I don't understand the record to be that for September. I understand it to have gone down, but not that there was one incident and that was it. That's not a-there were certainly protests throughout the month of September, but they were, as I earlier mentioned and the district court found, small, less than 30 people, largely sedate, generally peaceful. That's what was happening in September. I could take-so there was an incident on Labor Day on September 1st where there were increased protests. 125 people were involved in the activity. But what we have is a statement from FPS that they were not concerned with the group. That's at 46-1. They did-this is the day when the-the guillotine was displayed. They arguably protected political speech. There were 40 people who remained after the larger group left, and they did arrest a few. After that, you have September 2nd, completely uneventful. September 3rd, there was a drone flying. There were some altercations. Everything was managed. That's the consistency throughout the month of September, and there were occasions when there might be, you know, a larger number of protesters, but they were generally calm and sedated. Any of the sporadic and kind of more minimal criminal activity was appropriately handled by law enforcement resources, and that's what's supposed to happen because the situations that we're talking about, even the situations where it unfortunately could include an assault on a federal officer, that's a crime. That's a crime that was handled. They were arrested, and I understand that the U.S. Attorney's Office had 22-they're prosecuting 22 defendants. That's how this process is supposed to work. It's not that there is a protest. There is-and then you just send in the military. This is protected speech, and for the most part, it is calm and sedate, and it is- So the drone on, I guess this is the Wednesday, the suspect got violent and spit on agents. He was arrested and booked. That's general criminal activity that's handled appropriately by law enforcement. On the 4th, you have 20 protesters, and then there's only 15 at 830. On the 5th, SPS said it was a small group with low energy, no calls for service. On the 6th, there were 50 to 60 active protesters, lots of noise. They were energized, no arrests. September 7th, seven people, low energy. September 8th, 30 people. There were an altercation between protester and a counter-protester, not against the facility. This-it continues, and I'm happy to go through the record. This is helpful. We'll have to go through. I mean, I don't think there's any question that it's gone down in September, but part of the problem there is it's gone down largely because of this influx of other forces, which is outside of the regular use of those FPS officials, so- Does the record show us how many of the extra people remain in Portland, the FPS, and how many have been sent back to Portland? I don't know if you heard the question. I think it was-does it show-I mean, we know that up to 115 came. Do we know how many were there of the extra FPS? Maybe this is for- Am I on mute or something? Did you not hear? Yeah, we're not hearing you very well. It's kind of getting muffled for some reason. Well, I'm- There you go. Okay, I'm right by the microphone. Does the record show-the record is in front of us-how many of the FPS officers from outside of Portland who came in remain in Portland now, and how many have been sent back to somewhere else? I haven't been able to find the exact numbers, and much of the declarations don't have dates associated with them, so it is also very possible that those officers were sent in June, and they have all returned. We have a note within the last week before the president's announcement that there was a surge of officers that came out, and then there was no responsive protest activity, and so they went back to their respective offices. And then even after, I think that they may have plucked up their numbers in anticipation of the president's announcement, but then even then, there was some increased protest activity, but it went back down. And- So, the answer seems to be you don't know from-that we can't know from this record, and I believe counsel on the other side said, well, they haven't all gone home, but I understood him to be saying indirectly that some or many have gone somewhere else. Certainly. I mean, a lot of them have gone, and what we also know from one of the declarations is that SPS, they respond to even nonviolent protests. This is their job. They respond to threats, and they would use those numbers of officers to go to any kind of that exercises of speech just in case something becomes violent. So, this is squarely within their area of responsibility, and I know we continue to talk about SPS, but we haven't even talked about any of the other federal officers that are at the president's disposal. We have a ton of law enforcement agencies under the president's control. There's referencing in their declarations to circumstances, again, that are outside of what happened in Oregon, or even if there was potentially a bomb threat. Well, we don't have anything that connects the bomb threat to these protesters, and if you do, you have significant law enforcement resources, ATS, FBI, that can respond to those potential threats. That's their job. That's what they do. The problem that I have with this argument that I'm just trying to struggle with is, you know, the president gets to direct his resources as he deems fit, and it just seems a little counterintuitive to me that the city of Portland can come in and say, no, you need to do it differently. Now, I understand there's a statute here, and we're going to have to review that, but this goes to the level of deference that I think the president is entitled to in these circumstances, and it's not all driven. Would you agree it's not all driven by what we see on the streets? It's also driven to some degree by what's going on behind the scenes, and you don't have a full view into that. I acknowledge that there is certainly information behind the scenes, but we don't have that in this record, and we don't have the defendants coming forward and putting forth anything that shows that the sporadic and minimal instances of violence, criminal activity that was appropriately handled by law enforcement at Portland is part of a greater whole. I think the district court found that the defendants did not present any evidence that the sporadic violence was part of an organized attempt to overthrow the government, and that's, I think, what they're asking this court to potentially look at when you're talking about, for example, the shooting in Dallas, that that somehow increases the need. Well, that goes to the rebellion designation, but that doesn't necessarily go. I mean, you don't have to have that under prong three, do you, for the enforcement of the laws? Well, I'm sorry, I don't understand that. Well, I mean, enforcement of the laws, you seem to say, well, there's no attempt to overthrow the government, and I mean, that's a fight within the context of whether there's a rebellion under subsection two, but I don't know why that is relevant to subsection three, which doesn't have anything to do with rebellion and is just the enforcement of the laws. Well, I agree that the Dallas shooting shouldn't be the basis to send troops into Oregon, and if we're relying on that third prong, then it certainly, it doesn't make that more or less probable. Can I add just, and maybe my colleagues have final questions too, but, and I don't want to focus on, but I'm just perplexed, and I think Judge Beatty may have referenced this, so they reopened the building, they board the windows for protection, and what does the city of Portland do? They issue a zoning violation. Are you defending issuing a zoning violation, telling them to take off the boards that were put up to respond to protesters? Do you think that that was maybe ill-advised? Luckily, in this case, it's not something that the court needs to decide to determine whether or not the president's determination was within a colorable basis or within the range of honest judgment, but what we do know is that the circumstances at the time the president authorized the troops, whatever date that might be, they didn't raise to the level that was denied. Any other questions by my colleagues? No. Thank you. Thank you, Your Honor. We'll have three minutes of rebuttal. Thank you, Your Honor. I just have three quick points that I'd like to make. First, Judge Graber, going to your questions about the basis for the determination, I'm not relying solely on the June 7th memo. My basic understanding is the June 7th memo is where the president sort of set out the framework and his understanding and interpretation that violence directed at ICE officers that seeks to impede their execution of the immigration laws is the sort of circumstance that can warrant activating the guard, and the president then subsequently made a determination that those circumstances were satisfied in Portland. If you look at page 852 of our appendix, you'll see that's where the DHS request is. DHS said that the facility in Portland and the ICE officers and the FDS officers have come under coordinated assault by violent groups intent on obstructing lawful enforcement, lawful enforcement actions these groups have sought to impede through violent protest, intimidation, and sabotage of federal operations. That was the information that was before the president when he made this determination in September. Second point I want to make is about the language of the statute talking about a present inability to execute the laws because of the violence that's ongoing and the risk of violence that's ongoing. There is a present impediment to the execution of the laws because the forces are tied down addressing that risk. We've discussed the FDS officers. It's not just the FDS officers. It's also ICE personnel. If you look at page 885. Do you have an answer to Judge Graber's question about how many FDS? There were 115 that were there in July at least and maybe longer. How many are there? How many were there in September? I do not know the answer. I do not believe the record speaks to that. The citation that plaintiffs provide in their brief to say that someone's gone home is document 4626. You'll have to take a look at it for yourself. My best recollection, I don't have that document at my fingertips, my best recollection is it referenced about 10 people going home. But it's not just the FDS officers. If you look at paragraph 16 of the Cantu Declaration, it says the situation has resulted in FDS having to rely almost exclusively on ICE special response teams for assistance in preventing the violent protesters from attacking immigration officers and the ICE facility. And he explains that their primary mission is to be out in the field handling high-risk immigration enforcement operations. But they're not having to be diverted to protect the facility becoming a drain on immigration enforcement as well. If you look at the Wamsley Declaration paragraph 20, pages 877 to 78, it is to like effect. The final point that I want to make is although we do think the judge was clearly wrong to circumscribe the inquiry to what was happening in September, I think the district court also did minimize the violence in September. I just want to highlight a couple of documents that are in the record. One is that our supplemental appendix A2 to A3. Counsel, are you now withdrawing what you said earlier, which is that you are not challenging as clearly erroneous any of the specific factual findings that the district court did make as distinct from ignoring certain things? I'm not challenging factual findings about what she said in terms of X events occurred on Y date. There may have been other events that occurred on other dates that she didn't address. That's not, I think, an issue for clearly erroneous review. But if you look at page SA2 to 3, this is on September 28. This is one of the police reports. It starts out talking first about how a group of these agitators attacks two observers, breaking the driver's window and leaving one of them bleeding heavily from the face. Then it says there were 50 to 60 protesters outside of ICE at the time. Most of them were blocking the facility's driveway. I've read that document. I have a different question about it. Does that not post-date the final document on which you were relying as part of the call-up? September 28 is the memo from the secretary. Okay. Is that the final document on which you rely? I guess my question is, can you rely on any event that post-dates the mobilization to justify the pre-existing mobilization? In other words, let's say there's nothing that happens at all. This is a hypothetical. Nothing happens, but troops are mobilized, and two days later, there are terrible things that happen. Does that go back in time to justify, or does there have to be something at the time of the mobilization? I certainly think this evidence is fair game because it shows... That's not an answer to my question. Can you rely on later evidence to justify a prior authorization? I think we can rely on later evidence to show that there was a colorable, factual basis for the president's determination here because it demonstrates the very kind of risk that can materialize at any time with this sort of violent craft. But it's not just on the 28th. If you go back a week earlier on September 20th, this is that page A104 of our appendix. It says, another police report. SPS agents were busy tonight. There was a group of 50 at the facility. Again, once a marked car drives through, they will flip off screen and throw objects at the car, and in most cases, run towards the car as if they are going to charge the car. SPS Will Turner called me throughout the night with info about Black Walkers assaulting people. I received a video from SPS about a report about a journalist who was assaulted by a Black Walker with a large sword or stick. To be clear, even if these folks were still at ICER nearby, we would not be able to address the call or make an arrest with the resources that we have. This is hardly the peaceful and sedate crowd that plaintiffs tried to make it out to be. These are violent people, and at any point we let down our guard, there is a serious risk of ongoing violence. And at some point, the President is entitled, what his subordinates are telling him, we are overstretched. This is unsustainable. The officers aren't available to do their jobs. They're not available to surge to other places where we face violence. The President is entitled to say, enough is enough, and bring in the National Guard to reinforce the force. We would ask the court to grant a safe ending appeal as swiftly as possible. Thank you. Thank you to both counsel for your arguments in the case. The case will be taken under advisement and we'll respond as quickly as we're able. The case is now submitted. All persons having business with the Honorable United States Court of Appeal for the Ninth Circuit will now depart. So this court stands adjourned.
judges: GRABER, NELSON, BADE